BRYANT, Judge.
 

 *263
 
 Where the record provided substantial evidence to support the trial court's findings of fact and the conclusions of law, we affirm the Administrative Law Judge's (ALJ) final decision. Where the ALJ lacked
 
 *264
 
 authority to award back pay and attorney's fees, we vacate the portion of the final decision to award back pay and attorney's fees.
 

 Petitioner Teressa B. Rouse was employed by respondent Forsyth County Department of Social Services. She began her employment on 21 January 1997. In 2001, she was promoted to the position of Social Worker. By 2011, she had been promoted to a Senior Social Worker and began working in the respondent's Family and Children's Division After Hours Unit. As a Senior Social Worker, petitioner's duties included receiving and screening reports for abuse, neglect, and dependency. Since 2000, she had consistently received review ratings that her work "exceeded expectations." And prior to the event that gave rise to the underlying action, "[p]etitioner had no prior disciplinary action in her record." During her nineteen years of employment, there is no indication that respondent ever accused petitioner of failing to make a report. In her most recent employee evaluation, petitioner's supervisor wrote that petitioner had a "strong knowledge base" and a "grasp of afterhours protocols and guidelines."
 

 Part of respondent's protocols called for social workers to utilize computer-generated "CPS reports" created by the State to guide a social worker through a "decision tree" to recommend if the information received should be "screened in" for an investigation or "screened out" if no investigation was required. The State provided training on how to generate the reports and protocols and directed that every report that was "screened out ha[d] second and third levels of review to make sure that the screening
 
 *103
 
 was accurate." In addition to the State-required screen in and screen out options, respondent instituted a third option-"supportive counseling." The protocol for "supportive counseling" was not reduced to writing, and respondent provided no formal training on the procedure. Some social workers called supportive counseling "a 'usual practice' of not making a report if there is no abuse, neglect, or dependency. ... Other workers called it the 'after hours protocol' when a social worker decide[d] not to document a call in any way."
 

 Victor Isley, Division Director for [respondent's] Family and Children Services, testified that the county chose to implement this practice, because they "don't want to be off base with their screen out percentages" by including "
 
 general inquiry calls
 
 " in the CPS online assessment tools. ... This is because the percent of cases "screened out" is collected and shared with the State; having every call put in to a CPS report would "skew" their data.
 

 *265
 
 (emphasis added). However, respondent provided no formal training on how to distinguish a general inquiry from a non-general inquiry, and no second or third level of review was made following a determination that a call was a non-general inquiry call.
 

 On 20 June 2018, petitioner was working an after-hours shift when she was assigned a walk-in appointment made by a homeless man (the father) seeking temporary housing for his twelve year old son (the son). Petitioner engaged the father about potential family members and natural supports with whom the son could stay. The man stated that he had tried to communicate with the son's mother (the mother) but communication between them was difficult. Petitioner allowed the father to use her phone to contact the mother. During the ensuing conversation father and mother began to argue before petitioner interjected, introduced herself, and explained to the mother that the father and the son had come to respondent seeking a temporary residence for the son.
 

 The mother became irate complaining about the father and listing several reasons why she did not want her son. Petitioner asked the mother for a specific reason why the son could not stay with her. As petitioner explained the foster care process, which the mother said she didn't want on her record, she then blurted out, "Oh, yeah. He molested my daughters." Petitioner immediately followed up with questions she had been trained to ask: "Who is he?" "My son," the mother responded. "Are you telling me that he molested your daughters?" "I didn't say that," the mother responded. "Well, did you call law enforcement? Did you make a report?" "No, I didn't say that," the mother responded. "I didn't say he molested my daughters, I said he had tendencies." Petitioner questioned both the father and the son, and each denied the allegations.
 

 In seeking to find housing for the son, petitioner gave no credibility to the mother's statement that the son molested her daughters, as the mother had immediately retracted the statement. Petitioner counseled the mother telling her that she "[could not] go around and you should not go around saying these things, kind of things, especially if it didn't happen, because you can get some people in trouble."
 

 Ultimately, it was agreed the son would spend the night with his paternal grandmother and, thereafter, stay with his mother. At the end of her after-hours shift, an email was sent informing respondent of petitioner's efforts on behalf of the father and the son, and that petitioner had provided supportive counseling to the walk-in appointment.
 

 In mid-July 2016, respondent received a request for assistance from Wilkes' County DSS (WCDSS) regarding an allegation of child-on-child
 
 *266
 
 sexual misconduct. The victim's family was the same family with whom petitioner had spoken on 20 and 21 June. On 26 July, a meeting was held between petitioner, respondent's Family and Children Division Director Victor Isler, Program Manager Linda Alexander, and petitioner's supervisor, Alicia Weaver, to discuss petitioner's interactions with the mother, the father, and the son.
 

 At the end of the meeting, Division Director Isler informed petitioner that she would not go to work that night and that she would be reassigned to the day shift. There
 
 *104
 
 would be an internal investigation. By letter, petitioner was informed that she was being reassigned due to an internal investigation and that the reassignment was effective until 29 August 2016.
 

 On 12 September, petitioner received a "preconference document" informing her of a conference on 15 September 2016 to discuss dismissing her from her Senior Social Worker position within respondent's Family and Children Services Division. On 15 September 2016, petitioner met with the agency director who informed petitioner that the recommendation was for dismissal from respondent's agency, not simply the division of Family and Children Services. On 22 September 2016, petitioner received a formal dismissal letter from the agency.
 

 On 21 October 2016, petitioner filed a petition for a formal case hearing with the Office of Administrative Hearings contending that she was discharged without just cause. A hearing on the matter was commenced on 21 January 2017 in the Guilford County Courthouse before the Honorable J. Randall May, ALJ presiding. On 18 April 2017, ALJ May filed a final decision concluding that respondent substantially prejudiced petitioner's rights, failed to act as required by law, and acted arbitrarily and capriciously when dismissing petitioner. ALJ May ordered that petitioner be reinstated to her position as Senior Social Worker, or a comparable position, with all applicable back pay and benefits. In addition, respondent was ordered to pay petitioner's attorney fees. Respondent appeals.
 

 _________________________
 

 On appeal, respondent challenges the 18 April 2017 final decision arguing that the ALJ erred by concluding respondent failed to establish grossly inefficient job performance, failed to establish unacceptable personal conduct, and violated petitioner's procedural rights. Respondent raises five issues on appeal: whether the ALJ erred by (I) concluding that respondent lacked just cause to dismiss petitioner; (II) concluding that respondent violated petitioner's procedural rights; (III) making unsupported findings of fact; (IV) making unsupported conclusions
 
 *267
 
 of law; and (V) concluding that petitioner was entitled to an award of attorney's fees.
 

 Standard of Review
 

 Respondent appeals from the final decision of an ALJ who reviewed a final agency decision issued in accordance with the North Carolina Human Resources Act and the Administrative Procedures Act.
 
 N.C. Gen. Stat. §§ 126-34.02
 
 , 150B-34 (2017). Now on appeal before this Court, review is governed by General Statutes, section 150B-51 :
 

 (b) The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 (5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 (c) In reviewing a final decision in a contested case, the court shall determine whether the petitioner is entitled to the relief sought in the petition based upon its review of the final decision and the official record. With regard to asserted errors pursuant to subdivisions (1) through (4) of subsection (b) of this section, the court shall conduct its review of the final decision using the de novo standard of review. With regard to asserted errors pursuant to subdivisions (5) and (6) of subsection (b) of this section, the court shall conduct its review of the final decision using the whole record standard of review.
 

 N.C. Gen. Stat. § 150B-51(b), (c) (2017).
 

 I
 

 Respondent contends that the ALJ erred as a matter of law by concluding that
 
 *105
 
 respondent violated petitioner's procedural rights. We disagree.
 
 *268
 
 "Procedural due process restricts governmental actions and decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment."
 
 Peace v. Employment Sec. Comm'n
 
 ,
 
 349 N.C. 315
 
 , 321,
 
 507 S.E.2d 272
 
 , 277 (1998) (citation omitted). "The fundamental premise of procedural due process protection is notice and the opportunity to be heard."
 

 Id.
 

 at 322
 
 ,
 
 507 S.E.2d at 278
 
 ,
 
 349 N.C. 315
 
 (citation omitted).
 

 "The North Carolina General Assembly created, by enactment of the ... [North Carolina Human Resources Act], a constitutionally protected 'property' interest in the continued employment of career State employees."
 

 Id.
 

 at 321
 
 ,
 
 507 S.E.2d at 277
 
 ,
 
 349 N.C. 315
 
 ;
 
 see generally
 

 N.C. Gen. Stat. § 126-35
 
 (a) (2017) ("No career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause."). Our General Assembly also provided that the provisions of the State's Human Resources Act, codified in General Statutes, Chapter 126, "shall apply to: ... (2) All employees of the following local entities: ... b. Local social services departments."
 
 N.C. Gen. Stat. § 126-5
 
 (a)(2) b. (2017)
 
 [1]
 
 ;
 
 see also
 

 Watlington v. Dep't of Soc. Servs. Rockingham Cty.
 
 , --- N.C. App. ----, ----,
 
 799 S.E.2d 396
 
 , 401 (2017) ("The [State Human Resources Act] applies to ... certain local government employees, including those who work for local social services departments.");
 
 Early v. Cty. of Durham DSS
 
 ,
 
 172 N.C. App. 344
 
 , 354,
 
 616 S.E.2d 553
 
 , 560 (2005) ("[T]his Court has also held broadly: Local government employees ... are subject to the ... [Human Resources Act]. As such, they cannot be 'discharged, suspended, or demoted for disciplinary reasons, except for just cause.' G.S. § 126-35." (citation omitted) ).
 

 It is well settled that a career State employee enjoys a "property interest of continued employment created by state law and protected by
 
 *269
 
 the Due Process Clause of the United States Constitution. As a consequence, respondent could not rightfully take away this interest without first complying with appropriate procedural safeguards."
 
 Nix v. Dep't of Admin.
 
 ,
 
 106 N.C. App. 664
 
 , 666,
 
 417 S.E.2d 823
 
 , 825 (1992) (citations omitted). This applies equally to local career DSS employees, such as petitioner.
 
 See
 
 N.C.G.S. § 126-5(a)(2) b.;
 
 Early
 
 ,
 
 172 N.C. App. at 354
 
 ,
 
 616 S.E.2d at 560
 
 .
 

 Pursuant to our Administrative Code,
 

 [b]efore an employee may be dismissed, an agency must comply with the following procedural requirements:
 

 ....
 

 (d) The agency director or designated management representative shall conduct a pre-dismissal conference with the employee .... The purpose of the pre-dismissal conference is to review the recommendation for dismissal with the affected employee and to listen to and to consider any information put forth by the employee, in order to insure that a dismissal decision is sound and not based on misinformation or mistake.
 

 25 N.C. Admin. Code 01I .2308(4)(d) (2018).
 

 Respondent challenges four findings of fact and nine conclusions of law. We focus first on conclusion of law number 74 stating that respondent violated petitioner's procedural due process rights by,
 
 inter alia
 
 , failing to properly notify petitioner of the punishment to be determined by the pre-disciplinary conference.
 

 As set out in Issue II below, on 12 September 2016, petitioner was handed a
 
 *106
 
 written statement notifying her of a pre-disciplinary conference scheduled for 15 September 2016. Petitioner was advised that the basis of the pre-disciplinary conference was unacceptable personal conduct and grossly inefficient job performance. Per the written statement, "[t]he purpose of the conference is to discuss the recommendation of the [respondent] [to] dismiss you from the position of Senior Social Worker with the
 
 Family and Children's Division
 
 of [respondent]." (emphasis added). Petitioner sought to contact Agency Director Donahue and her county human resources office representative, but was denied a meeting with both. Petitioner testified to her understanding that the pre-disciplinary conference was to discuss her dismissal from respondent's Family and Children's
 
 Division
 
 ; however, during the pre-disciplinary conference she was informed that the conference was
 
 *270
 
 to discuss her dismissal from the respondent's
 
 agency
 
 . As the ALJ found in the final decision, the following statements were made during the pre-disciplinary conference:
 

 73. ... I know [respondent] recommended dismissal of me from the division; really I am ok with that; I have spoken with you [Debra Donahue] regarding other interests that I have in the agency, I just want to use my services to make a difference in the agency/community.
 

 74. [Agency Director] Donahue responded, "Let me give you clarity regarding the recommendation; the recommendation is to dismiss you from the agency, not the Division."
 

 75. Petitioner responded,
 

 "Thank you for the clarity, I thought it was dismissal from the Division; in 19 years, I have never had a written warning, I am floored, almost speechless; it really bothers me that people think I would intentionally harm or place a child in harm
 
 [']
 
 s way; I have always followed the letter of the law when it comes to child welfare, I have never taken a shortcut, never a written warning, I'm just taken aback."
 

 Thereafter, petitioner received no further written notice or opportunity to be heard in a pre-disciplinary conference, as to dismissal from respondent, as opposed to a division of respondent. On 22 September 2016, petitioner received her dismissal letter which stated that "you are dismissed from your position as a Senior Social Worker with [
 
 respondent
 
 ]."
 

 As dismissal from a division within an agency and dismissal from the agency are different punishments, respondent failed to provide petitioner with sufficient notice of the potential punishment to be determined during the pre-disciplinary conference. Reasonable notice of dismissal encompasses notice of sanctions or from what employment the accused may be dismissed.
 
 See
 

 Peace
 
 ,
 
 349 N.C. at 322
 
 ,
 
 507 S.E.2d at 278
 
 ("The fundamental premise of procedural due process protection is notice and the opportunity to be heard." (citation omitted) ). We uphold the ALJ's conclusion that respondent's lack of notice violated petitioner's procedural due process rights. Accordingly, respondent's argument on this point is overruled.
 

 *271
 
 Having determined petitioner's due process right to notice and opportunity to be heard have been violated, we need not address whether prolonging her investigatory period without authorization was a violation of petitioner's due process rights.
 

 II & III
 

 Respondent argues that the ALJ erred by concluding that respondent failed to establish just cause for petitioner's dismissal due to grossly inefficient job performance. Respondent challenges several of the findings of fact as unsupported by substantial evidence and conclusions of law as unsupported by the findings of fact.
 

 Pursuant to our General Statutes, "[n]o career State employee subject to the North Carolina Human Resources Act shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause. ... The State Human Resources Commission may adopt, subject to the approval of the Governor, rules that define just cause."
 
 N.C. Gen. Stat. § 126-35
 
 (a) (2017). Pursuant to the North Carolina Administrative Code, Title 25 ("Office of State Human Resources") (previously
 
 *107
 
 codified within our General Statutes, Chapter 126), the two bases for "the discipline or dismissal of employees under the statutory standard of 'just cause' as set out in G.S. 126-35 [include] .. [d]iscipline or dismissal imposed on the basis of unsatisfactory job performance, including grossly inefficient job performance." 25 N.C. Admin. Code 1I.2301(c)(1) (2018) (Just Cause for Disciplinary Action).
 

 Gross Inefficiency (Grossly Inefficient Job Performance) occurs in instances in which the employee fails to satisfactorily perform job requirements as specified in the job description, work plan, or as directed by the management of the work unit or agency and that failure results in:
 

 (1) the creation of the potential for death or serious harm to a client(s), an employee(s), members of the public or to a person(s) over whom the employee has responsibility; or
 

 (2) the loss of or damage to agency property or funds that result in a serious impact on the agency or work unit.
 

 25 N.C. Admin. Code 01I.2303(a).
 

 This Court has held that to determine if just cause exists to dismiss an employee for grossly inefficient job performance "the [agency]
 

 *272
 
 must prove that (1) the employee failed to perform his job satisfactorily and (2) that failure resulted in the potential for death or serious bodily injury."
 
 Donoghue v. N.C. Dep't of Corr.
 
 ,
 
 166 N.C. App. 612
 
 , 616,
 
 603 S.E.2d 360
 
 , 363 (2004) (citation omitted).
 

 On appeal, respondent contends that because petitioner failed to generate a formal or informal, handwritten or computerized CPS report following the interview with the father, the son, and the mother, she created the potential for serious harm to a family in violation of General Statutes, section 7B-301(a),
 
 [2]
 
 the North Carolina Child Abuse Reporting Law.
 

 Respondent challenges several (A) findings of fact and (B) conclusions of law on the topic of grossly inefficient job performance.
 

 A.
 

 Respondent specifically challenges the following findings of fact:
 

 44. Petitioner treated this as a "general inquiry" about foster care, because none of the parties wished to make a report and she had
 
 no independent cause
 
 to suspect that child abuse had occurred.
 

 46. On or about mid July 2016, Respondent received a request for assistance from Wilkes County Department of Social Services regarding an allegation of child on child sexual misconduct because the mother was not cooperating; and the father stated that none of it was true and wanted to work with the social worker that he had met in Forsyth County. ...
 

 47. On July 26, 2016, a meeting was held with Petitioner, Victor Isler; Program Manager, Linda Alexander; and Petitioner's supervisor, Alicia Weaver. During this meeting, it was discovered that this family was the same family that Petitioner had interacted with on June 20, 2016.....
 

 48. Petitioner was honest and forthcoming .... She also informed that she had received a phone call from the attorney of the mother threatening Petitioner and the father
 
 *273
 
 because the mother was not letting him visit her son in [sic] the previous week.
 

 (emphasis added).
 

 Petitioner's testimony-as set forth in other unchallenged findings of fact-support finding of fact number 44 that she had no cause to suspect abuse. For instance, petitioner first spoke with the mother during an "aggressive" conversation between the mother and the father after the father had brought the son into respondent's agency seeking a temporary residence for him. As petitioner was exploring alternative options to foster care placement, the mother gave the following reasons why she did not want the son to live with her:
 

 - That she is now married
 
 *108
 
 - That her two daughters do not acknowledge the father as their father
 

 - That she wanted her new husband to adopt their daughters
 

 - That the father's other relatives should take care of the son
 

 - That the father was verbally and physically abusive
 

 - That the son called her a crack whore when he was six
 

 - That she is in nursing school and had a busy schedule
 

 - That she had no room for her son
 

 When informed that none of those reasons indicated why her son could not come live with her, the mother continued to express her strong dislike for the father. When asked if the mother wanted the son to be placed in foster care, the mother responded, "Well, I don't want that, I don't want that on my record." At a later point, "the mother blurted out, 'Oh, yeah. He molested my daughters.' "
 

 35. Petitioner immediately launched into her trained follow up questions. Petitioner asked, "Well, who is he?" and the mother said, "My son". [sic] Petitioner asked for clarification, "Are you telling me that he molested your daughters?" The mother immediately recanted and stated, "I didn't say that." Petitioner then asked the mother, "Well, did you call law enforcement? Did you make a report?" The mother continued to deny, "No. I didn't say that." The mother then said, "I didn't say he molested my daughters, I said he had tendencies." ....
 

 *274
 
 36. Petitioner questioned both the father and the son, and asked if this was true; the father and son each denied the allegation. ....
 

 ....
 

 45. The next day, the mother, the father, and the grandmother informed Petitioner that the mother was taking the son and that the issue was resolved.
 

 Even during the hearing on respondent's disciplinary action of terminating petitioner, the ALJ found that "the mother testified at the hearing, under oath, that she never stated to Petitioner that her son had molested her daughters. ..."
 

 The record provides substantial evidence in support of the ALJ's finding of fact number 44, "[p]etitioner ... had no independent cause to suspect ... child abuse[, neglect, or dependency]."
 

 In finding of fact number 46, respondent contends that WCDSS contacted respondent because of allegations of sexual activity prior to respondent's facilitation of the son's placement with the mother and her daughters. Respondent's contention is without merit.
 

 On the contrary, the finding of fact shows that WCDSS requested assistance from respondent as petitioner had previously been involved with the family. This finding is supported in part by the mother's testimony where she denies saying her son had sexually molested his siblings. When asked, she responded:
 

 Absolutely not. Where that came from I have no idea. If at any time I have thought he would have molested my daughters or had have, regardless of how old he was, I would have done then what I did on June -- July 16th and had my daughters at Brenner's Hospital, the Wilkes County Sheriff's Department at my house, as well as Wilkes County DSS.
 

 Finding of fact 42 is related to finding of fact 46 and is supported by testimony in the record from at least two witnesses.
 

 While respondent urges there is contrary testimony as to finding of fact number 48, it is clear from petitioner's testimony concerning her telephone call, that there is substantial evidence to support this finding by the ALJ.
 

 *275
 
 B.
 

 Respondent next challenges portions of the ALJ's conclusions of law related to respondent's claims of grossly inefficient job performance.
 

 30. ... With respect to the policy violations cited, the weight of the evidence fails to show Petitioner's violation of the policies named by Respondent in the dismissal letter.
 

 31. The greater weight of the evidence does not establish a violation of
 
 *109
 
 N.C.G.S. § 7B-301. N.C.G.S. § 7B-301 makes it a class 1 misdemeanor to knowingly or wantonly fail to report the case of a juvenile, when that person has cause to suspect that any juvenile is abused, neglected, or dependent. The North Carolina Courts have not defined "cause to suspect;" [sic] however, the North Carolina School of Government provides:
 

 The standard is not just a suspicion but cause to suspect. However, a person deciding whether to make a report also must consider a child's statements, appearance, or behavior (or other objective indicators) in light of the context; the person's experience; and other available information." Janet Mason, Reporting Child Abuse and Neglect in North Carolina 67 (3d ed. 2013), available at https://www.sog.unc.edu/sites/www.sog.unc.edu/files/full_text_books/Mason_%20Reporting-Child-Abuse_complete.pdf.
 

 Petitioner was the only person to provide firsthand testimony of what she heard and observed that day. Petitioner testified extensively, and throughout Respondent's investigation, that based on the context of the statements, her experience, and ability to observe and interact with the child, she had no cause to suspect abuse. It is Respondent's burden to prove that Petitioner had cause to suspect abuse and knowingly chose not to report the abuse. This was not established by the greater weight of evidence.
 

 32. The greater weight of evidence does not establish a violation of 10A N.C.A.C. 70A .0105, which dictates that
 
 *276
 
 the "county director shall receive and initiate an investigation on all reports of suspected child abuse, neglect, or dependency, including anonymous reports."
 

 33. Petitioner never admitted that she violated 10A N.C.A.C. 70A .0105(a) ; instead, she remained adamant that she followed Respondent's "supportive counseling policy." Nowhere in 10A N.C.A.C. 70A .0105(a) does it state that Petitioner must inform her supervisor of all facts when providing supportive counseling and must generate a FDCSS report for all intakes.
 

 35. The majority of the credible evidence presented indicated that Petitioner may have violated Respondent's "supportive counseling policy." However, Respondent did not list that as a basis for Petitioner's dismissal, and it is not addressed here.
 

 36. Even if Respondent had presented sufficient evidence that Petitioner failed to satisfactorily perform job requirements, the grossly inefficient job performance claim fails because Respondent was required to make an evidentiary connection between Petitioner's actions and the harm. Respondent failed to do this. See Clark v. N.C. Dep't of Pub. Safety, No. COA15-624,
 
 2016 WL 4608179
 
 , 2016 N.C. App. LEXIS 897 (Ct. App. Sep[t]. 6, 2016) [.]
 

 As to conclusions of law numbered 30, 31, 32, and 33, respondent generally argues that petitioner failed to create a report in compliance with State policy that would have initiated a second level of review and allowed petitioner's supervisor to make a determination of whether the information gathered during the initial intake meeting with the father and the son constituted abuse, neglect, or dependency, or warranted further investigation.
 

 As set forth in the final decision, our Administrative Code sets out that
 

 Gross Inefficiency (Grossly Inefficient Job Performance) occurs in instances in which the employee fails to satisfactorily perform job requirements as specified in the job description, work plan, or as directed by the management of the work unit or agency and that failure results in:
 

 (1) the creation of the potential for death or serious harm to a client(s), an employee(s), members of the public
 
 *277
 
 or to a person(s) over whom the employee has responsibility; or
 

 (2) the loss of or damage to agency property or funds that result in a serious impact on the agency or work unit.
 

 25 N.C. Admin. Code 01I.2303(a).
 

 As the ALJ concluded, petitioner had performed the job requirements as directed by the management group for the agency for which she worked. The substantial evidence and findings of fact indicate that petitioner
 
 *110
 
 provided supportive counseling to the father and the son on 20 and 21 June 2016 and notified her supervisor of the counseling provided during her work shift. Supportive counseling was not included in the State's intake CPS reporting mechanism, but was a practice utilized by respondent's management.
 

 Moreover, in the ALJ's unchallenged findings of fact, during the investigation of petitioner's 20 June 2016 incident, petitioner's supervisor, Stanfield, was not asked to provide a written account of what he recalled, and he was not provided with a written copy of petitioner's statement of the events on that date.
 

 As the substantial evidence and findings of fact indicate that petitioner provided supportive counseling to the father, the mother, and the son on 20 June 2016, that supportive counseling was not a stated ground for petitioner's dismissal, and because petitioner's supervisor failed to indicate what information he had received, the ALJ concluded that petitioner's dismissal could not be upheld on the ground of grossly inefficient job performance. We agree and overrule respondent's challenge to conclusions of law 30, 31, 32, 33, and 35.
 

 Respondent lists conclusion of law number 36 ("Respondent was required to make an evidentiary connection between Petitioner's actions and the harm. Respondent failed to do this.") as one challenged on appeal, but does not otherwise specifically address this conclusion in its brief before this Court.
 
 See
 
 N.C. R. App. P. 28(a) (2018) ("Issues not presented and discussed in a party's brief are deemed abandoned."). We note that we overruled respondent's challenge to finding of fact number 44 ("Petitioner ... had no independent cause to suspect ... child abuse[, neglect, or dependency].") under subsection A,
 
 supra
 
 . Therefore, we dismiss respondent's challenge to this conclusion of law.
 

 Accordingly, we overrule or dismiss respondent's challenges to the ALJ's findings of fact and conclusions of law addressing grossly inefficient job performance.
 

 *278
 

 IV
 

 Next, respondent argues that the ALJ erred by concluding that respondent failed to establish just cause for dismissal based on unacceptable personal conduct.
 

 Our Administrative Code provides that "[e]mployees may be dismissed for a current incident of unacceptable personal conduct." 25 N.C. Admin. Code 01I .2304(a) (2018) (Dismissed for Personal Conduct). Unacceptable personal conduct is defined in pertinent part as:
 

 (1) conduct for which no reasonable person should expect to receive prior warning; or
 

 (2) job related conduct which constitutes violation of state or federal law; or
 

 ....
 

 (4) the willful violation of known or written work rules; or
 

 (5) conduct unbecoming an employee that is detrimental to the agency's service[.]
 

 25 N.C. Admin. Code 01I .2304(b)(1), (2), (4), and (5).
 

 Using the test for determining just cause for discipline due to unacceptable personal conduct as presented in
 
 Warren v. N.C. Dep't of Crime Control
 
 ,
 
 221 N.C. App. 376
 
 ,
 
 726 S.E.2d 920
 
 (2012), the ALJ stated
 

 (a) did the employee engage in the conduct the employer alleges;
 

 (b) does the employee's conduct fall within one of the categories of unacceptable conduct provided in the Administrative Code; and
 

 (c) if the employee's actions amount to unacceptable personal conduct, did the misconduct amount to just cause for the disciplinary action taken? Just cause must be determined based upon an examination of the facts and circumstances of each individual case.
 

 See generally
 

 id.
 
 at 381,
 
 726 S.E.2d at 924-25
 
 .
 

 Respondent alleges unacceptable personal conduct under sections (1), (2), (4), and (5). After extensive review, the ALJ determined respondent did not have just cause to dismiss petitioner for unacceptable
 
 *279
 
 personal conduct. On appeal, respondent challenges six of the
 
 *111
 
 ALJ's findings of fact (16, 17, 18, 24, 42, and 43) and nine conclusions of law (44, 45, 48, 49, 50, 51, 54, 55, and 56). We address primarily the findings of fact and conclusions of law related to part (c) of the
 
 Warren
 
 test ("[D]id the misconduct amount to just cause for the disciplinary action taken?").
 

 In the final decision, under the heading "Did Petitioner engage in the conduct as alleged?" the ALJ concluded
 

 the preponderance of the evidence shows that Petitioner engage[d] in the conduct alleged by Respondent. While there is some evidence to the contrary ... the greater weight of evidence demonstrates that Petitioner did not inform her supervisor of the allegations of child on child sexual abuse and did not create a FCDSS Computerized Report.
 

 However, the ALJ further concluded that "[e]ven if Petitioner's action(s) were, at some level, considered to be some type of unacceptable personal conduct, Petitioner's actions did not constitute just cause for dismissal when the equities in this case are balanced." The ALJ made the following conclusions:
 

 51. Even if Petitioner's action(s) were, at some level, considered to be some type of unacceptable personal conduct, Petitioner's actions did not constitute just cause for dismissal when the equities in this case are balanced. Those include the following: 1) Petitioner's substantial, 19 year, discipline-free employment history with Respondent, as well as her record of good performance in her duties as recorded in her performance reviews; 2) Petitioner received no training in "supportive counseling"; 3) the supportive counseling policy was not in writing; 4) Donahue and Isler admitted that they did not look at Petitioner's employment evaluations or the length of her employment before reaching their decisions; 5) the supportive counseling policy was not frequently enforced; 6) there was at least one other time that Respondent listened to allegations of abuse by local police and were told not to document it; and 7) Petitioner was honest and forthcoming throughout the entire investigation.
 

 ....
 

 54. Respondent's investigation and treatment of Petitioner was also fundamentally unfair. This began with
 
 *280
 
 violating Petitioner's procedural rights by erroneously prolonging her investigatory period without authorization. Respondent never spoke with Petitioner to learn why she applied "supportive counseling" or who trained her that way. Respondent then created self-serving hypotheticals to try to justify that this harm was not part of improper oversight and training on behalf of Respondent. Mr. Isler learned that intake workers were no longer applying "supportive counseling" after this incident, and did not inform the agency director. The pre-dismissal letter stated that the recommended discipline was a dismissal from the division, not the agency. The agency director refused to meet with Petitioner prior to her pre-disciplinary conference. Respondent's HR department told Petitioner to go back to the agency director. When the agency director learned, during the pre-disciplinary conference, that Petitioner understood [t]hat the recommendation was dismissal from the agency, she made no effort to correct the written notice of a second pre-disciplinary conference after she was made aware of the misrepresentation.
 

 55. Respondent has met its burden of proof to show that Petitioner engaged in unacceptable conduct ["the greater weight of evidence demonstrates that Petitioner did not inform her supervisor of the allegations of child on child sexual abuse and did not create a ... Computerized Report,"] however, after considering the totality of the facts and circumstances, Respondent did not have just cause to dismiss Petitioner from her employment.
 

 56. Respondent substantially prejudiced Petitioner['s] rights; acted erroneously; failed to act as required by law; and acted arbitrarily and capriciously when Respondent dismissed Petitioner without just cause.
 

 The findings of fact, supported by substantial evidence, indicate that on 26 July 2016, petitioner met with Victor Isler, Program Manager Linda Alexander, and Supervisor
 
 *112
 
 Alicia Weaver. Petitioner was honest and forthcoming regarding the events which had occurred 20 and 21 June 2016 while counseling the father, the mother, and the son. Petitioner stated that she applied respondent's supportive counseling policy as she understood it-a policy that was never set out or reduced to writing. Isler informed petitioner that there would be an investigation and that she would be temporarily reassigned to the dayshift due to
 
 *281
 
 the investigation. The reassignment was to last 33 calendar days, until 29 August 2016. Respondent demanded that petitioner document her statements during the 26 July 2016 meeting and to create a CPS report. Petitioner complied with both requests. On 29 August 2016, respondent informed petitioner that her temporary assignment was extended until 12 September to "further investigate" and "allow time to schedule and conduct a pre-disciplinary conference subject to agency findings."
 

 During the investigation, social workers were individually invited to meet with Isler, Alexander, and Weaver and posed hypothetical questions to determine how the social workers would respond with regard to applying supportive counseling. The social workers were aware that petitioner had been reassigned due to an internal investigation regarding supportive counseling. At least two responses indicated that "[i]n the past, we would have offered supportive counseling, but currently we're going to make a report," and "two weeks ago I would have provided information, but now I document everything." The findings from the social worker interviews were not shared with Agency Director Debra Donahue. Petitioner was not asked how she was trained to apply supportive counseling, and petitioner was not asked to respond to the hypotheticals. Petitioner's after-hours supervisor, Michael Stanfield, was not asked to provide a written account of what he recalled of the 20 June 2016 events and was not provided petitioner's written account of her statements made during the 26 July 2016 meeting with Isler, Alexander, and Weaver.
 

 On 12 September 2016, petitioner was notified of a pre-disciplinary conference scheduled for 15 September to address unacceptable personal conduct and grossly inefficient job performance. "The purpose of the conference is to discuss the recommendation the [respondent] dismiss you from the position of Senior Social Worker with the Family and Children's division of [respondent]." Petitioner asked to speak with Agency Director Donahue, but was told that Donahue could not speak with her about the conference. Petitioner contacted her county human resources representative and made an appointment to meet on 14 September. On 13 September, petitioner received an email cancelling the meeting with the human resources representative.
 

 During the 15 September pre-disciplinary conference on petitioner's dismissal, Agency Director Donahue informed petitioner that the conference was to consider petitioner's dismissal from the
 
 agency
 
 , not just the
 
 division
 
 . Petitioner's response was that she was "floored, almost speechless." Respondent did not provide petitioner with a new notice for a pre-disciplinary conference or a new pre-disciplinary conference.
 

 *282
 
 On 22 September 2016, petitioner received a ten page dismissal letter stating "effective as of today ... you are dismissed from your position as a Senior Social Worker with [respondent]."
 

 Upon review of the record and respondent's arguments, we hold respondent has failed to raise a meritorious argument significantly challenging these conclusions of law or the underpinning findings of fact. Therefore, we hold that substantial evidence supports the findings of fact, and that the findings of fact support the ALJ's challenged conclusions of law 51, 54, 55, and 56. Accordingly, we overrule respondent's arguments.
 

 V
 

 Lastly, respondent argues that the ALJ erred by concluding that petitioner is entitled to remedies under 25 N.C.A.C. 01J.1306, including an award of attorney's fees and back pay. We agree.
 

 In his final decision, the ALJ
 

 ORDERED that Petitioner ... be reinstated to her position as Senior Social Worker, or comparable position ....
 

 *113
 
 Petitioner shall be retroactively reinstated to this position of employment with the Respondent, with all applicable back pay and benefits. Respondent shall pay to Petitioner and her attorney all reasonable attorney fees and cost incurred in this Contested Case pursuant to N.C.G.S. § 150B-33(11).
 

 Back Pay
 

 Pursuant to Subchapter J of Title 25 within our Administration Code, in a grievance an employee may receive back pay "in all cases in which back pay is warranted by law." 25 N.C. Admin. Code 01J.1306(1) (2018). This Court has held that Title 25's Subchapter J applies to State employees, while Subchapter I applies to local government employees.
 
 Watlington
 
 , --- N.C. App. at ----,
 
 799 S.E.2d at 403
 
 . "[A] local government employee shall mean those employees of local social services departments, public health departments, mental health centers and local offices of civil preparedness which receive federal grant-in-aid funds." 25 N.C. Admin. Code 01A .0103(6) (2018).
 

 Title 25 contains the rules adopted by the [State Human Resources] Commission and includes distinct subchapters on various personnel topics. ....
 

 *283
 
 Subchapter I, "Service to Local Governments," provides the procedures and rules specific to the personnel system developed for local government employees, including subsections on recruitment and selection, classification, and compensation.
 
 See
 
 25 NCAC 01I.1800, .1900, and .2100 (2016). Subchapter I includes a separate subsection on "Disciplinary Action: Suspension, Dismissal and Appeals," which includes rules regarding just cause and dismissal for unacceptable personal conduct. 25 NCAC 01I.2301 and .2304 (2016). These rules vary slightly from the rules and procedures stated under Subchapter J.
 
 See
 
 25 NCAC 01J.0603 - .0618.
 

 Id.
 

 at ----,
 
 799 S.E.2d at 402
 
 .
 

 Respondent argues that it is a local government agency that is governed by Subchapter I of the N.C. Admin. Code, Title 25-not Subchapter J. We agree. Therefore, the ALJ erred in awarding petitioner back pay pursuant to Title 25 N.C. Admin. Code 01J.1306. On this ground, we vacate the portion of the order in the final decision to award back pay.
 

 Attorney's Fees
 

 " N.C. Gen. Stat. § 150B-33 [ (b) ](11) allows [an] ALJ to award attorney's fees ... under certain circumstances[.]"
 
 Watlington
 
 , --- N.C. App. at ----,
 
 799 S.E.2d at 405
 
 . Pursuant to General Statutes, section 150B-33, "[a]n administrative law judge may ... [o]rder the assessment of reasonable attorneys' fees ... against the
 
 State agency
 
 involved in contested cases decided ... under Chapter 126 where the administrative law judge finds discrimination, harassment, or orders reinstatement or back pay." N.C. Gen. Stat. § 150B-33(b)(11) (2017) (emphasis added).
 

 Here, respondent is not a State Agency. Accordingly, the ALJ was without authority to award petitioner's attorneys' fees pursuant to section 150B-33(b)(11). Accordingly, we vacate the portion of the order in the final decision to award attorney's fees.
 

 AFFIRMED IN PART; VACATED IN PART.
 

 Judges DILLON and TYSON concur.
 

 [1]
 

 For the purposes of [General Statutes, Chapter 126], unless the context clearly indicates otherwise, "career State employee" means a State employee or an employee of a local entity who is covered by this Chapter pursuant to G.S. 126-5(a)(2) who:
 

 (1) Is in a permanent position with a permanent appointment, and
 

 (2) Has been continuously employed by the State of North Carolina or a local entity as provided in G.S. 126-5(a)(2) in a position subject to the North Carolina Human Resources Act for the immediate 12 preceding months.
 

 N.C. Gen. Stat. § 126-1.1
 
 (a) (2017).
 

 [2]
 

 "Any person or institution who has cause to suspect that any juvenile is abused, neglected, or dependent, as defined by G.S. 7B-101, or has died as the result of maltreatment, shall report the case of that juvenile to the director of the department of social services in the county where the juvenile resides or is found." N.C. Gen. Stat. § 7B-301(a) (2017).